## *United States District Court*

### FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **Kathryn Lynn Campbell** | ) |
| **2540 Flint Hill Road** | ) |
| **Vienna, Virginia  22181-5451** | ) |
|     **On behalf of herself and similarly** | ) |
|     **situated Equity Units holders of** | ) |
|     **American International Group, Inc.** | ) |
|  | ) |
| **PLAINTIFFS,** | ) |
|  | ) |
|          **Versus** | ) **Civil Action No. _____** |
|  | ) |
| **American International Group, Inc. (AIG)** | ) |
|     **and** | ) |
| **R.H. Benmosche, Chairman, President, CEO** | ) |
| **W.D. Cornwell, J.H. Fitzpatrick,** | ) |
| **S.N. Johnson, L.T. Koellner, D.H. Layton,** | ) |
| **C.S. Lynch, A.C. Martinez, G.L. Miles, Jr.,** | ) |
| **H.S. Miller, R.S. Miller, Jr., M.W. Offit,** | ) |
| **R.A. Rittenmeyer and D.M. Steenland** | ) |
|     **Members of the Board of Directors** | ) |
|  | ) **JURY TRIAL DEMAND** |
|     **DEFENDANTS.** | ) |
|  | ) |
_____ )

SERVE:

Robert F. Carangelo, Esquire
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153-0119
Tel: +1 212-310-8499
Fax: +1 212-310-8007
Email: robert.carangelo@weil.com
Attorneys for the Defendants.

## **COMPLAINT**

1.      COMES NOW, Kathryn Lynn Campbell, to respectfully submit this "covered" securities class action Complaint, pursuant to the Securities Act of 1933 and 1934, respectively 15 U.S.C. § 77p and 15 U.S.C. § 78bb(f), against American International Group, Inc. and Board of Directors ("AIG' or "Defendant" or "Defendants") on behalf of herself and similarly situated holders of AIG's Equity Units whose securities were mandatorily converted into (exchanged for) the common shares of the issuer on three dates specific:  **FEBRUARY 15, 2011, MAY 1, 2011** and **AUGUST 1, 2011** (hereinafter the "Plaintiffs").

2.      Plaintiffs aver that all elements for a covered class action are fulfilled inasmuch as:

A.      The similarly situated class members are "public" or retail investors who acquired the Equity Units through instrumentalities of interstate commerce (including the national exchanges) upon the Defendant's re-marketing of the securities to "public investors" through its affiliates and underwriters.

B.      No individualized claim(s) of reliance on alleged misstatement or omissions are asserted including by Plaintiff at bar.  The factual averments and questions of law proffered are common to all class members.

C.      The core of the Complaint entails the mandatory conversion of the subject Equity Units into the common shares of AIG in breach of the terms represented by the Defendants and in violation of applicable laws as herein set forth.

D.      The state law based claim of extraordinary bad faith and unfair dealing in breach of the "the implied duty of good faith and fair dealing" mandated by the law of the State of New York is asserted because the Defendants prescribed New York state law as the "Governing law" tangent

to matters associated with the Equity Units' offering.

      E.     The remaining state law based causes of action (including Plaintiffs' claims of breach of the covenant of good faith and fair dealing, bad faith breach of the covenant of good faith and fair dealing and/or unjust enrichment) are appropriately asserted under the common law of the State of Delaware because Delaware is the state of incorporation of the Defendant, *vide* 15 U.S.C. § 78bb(f)(3)(A)(i) and (ii) [preserving "Actions under State Law of Incorporation," and permitting "covered class action" thereunder].

## JURISDICTION AND VENUE

      3.     Plaintiffs' invoke this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1337, the Securities Exchange Act of 1933, 15 U.S.C. § 77p and the Securities Exchange Act of 1934, 15 U.S.C. 78aa.   Plaintiffs specifically rely on the provisions of 15 U.S.C. § 78bb(f)(3)(A)(I) and (ii) preserving and permitting covered class action under State Law of Incorporation.

      4.     This Court also has supplemental jurisdiction over the related State law based claims pursuant to 28 U.S.C. § 1367(a) inasmuch as the federal and state law claims arise from and share common nucleus of operative facts.

      5.     Venue is proper in this district because the Defendant is engaged in transacting insurance and financial services nationwide, including this district (as well as internationally); *vide* 28 U.S.C. § 1391(b) *cum* 15 U.S.C. 78aa.   In addition, this district is the situs of the Federal Government which controls the vast majority (over 70 percent) of Defendant's equities.

## NATURE OF THE COMPLAINT

6.    The Defendant is incorporated in the State of Delaware and is engaged in the insurance and financial services business nationwide and globally.

7.    In January 1987, Defendant established its infamous AIG Financial Products unit. Permeated by *"recklessness and greed,"* the Financial Products Division manufactured *"immensely profitable" and "deceptive"* financial products that eventually poisoned the entire global financial system resulting in a taxpayer funded *"massive bailout"* of AIG in 2008 to the tune of 182 billion dollars!  "AIG's Financial Products Unit finally died the week of August 6, 2011.  It was 24." [***Plaintiffs Exhibit {P.E.} # 1,*** *italics added*].[1]

**The Equity Units and Their Nomenclatures:**

8.    Aware of the impending financial crises its reckless and deceptive activities are about to unleash, AIG embarked upon a 20 billion dollars capital raising effort in May 2008. ***[P.E. # 2].*** Among the devices it concocted to raise new capital was the issuance of what it called AIG Equity Units.

9.    The Equity Units were offered in what Defendant called "Prospectus Supplement" dated May 12, 2008.  It asserted that the subject prospectus was a supplement to the "Prospectus Dated July 13, 2007".  But, as set forth below, the Equity Units are original issue securities and had nothing alike to supplement.

---

[1] Defendant has a long history of unrelenting dishonest business practices.  See, inter alia, *In re American International Group, Inc.,* 965 A.2d 763 (Del. Ch., 2009).

10.     The Prospectus for the Equity Units was in accord with the infamous tradition of AIG's Financial Products Division for devising complex and dishonest financial instruments devoid of good faith and fair dealing, permeated by deliberately confusing formulas set forth in the context of its specialized knowledge and expertise, and further imbued in bad faith.  Thus, *the Prospectus consisted of two-hundred-and-five (205) pages -- all in fine print;  all in 10 point pitch*! ***[P.E. # 3; also referred to as the "Prospectus"].***

11.     Defendants used multiple confusing nomenclatures to refer to the Equity Units:

A.      Labeling them as ***"debt securities,"*** Defendant garnered for itself substantial tax advantages;

B.      Labeling them as ***"stock purchase contracts,"*** Defendant posits that the Equity Units did not represent securities, but the contractual duty to purchase its common shares;

C.      Labeling them as ***"mandatorily convertible securities"*** into AIG's common shares, Defendant has successfully enticed "public investors" to acquire the Equity Units;

D.      Labeling them as ***"Corporate Units,"*** Defendant shrouded the Equity Units in complex and incomprehensible formulas exclusively within the knowhow and expertise of the likes of Sullivan and Cromwell, LLPs (crafter of the Prospectus) or the accounting and wealth management expertise of its underwriters (listed below).  Public investors do not have access to such legends of specialized skills and expertise to advise them as to the equities intended for re-marketing to them;

E.      Labeling them as ***"Treasury Units,"*** Defendant ensured that the security it intended to re-market to "public investors" would be beyond the comprehension of its end-users, i.e. the target retail investors.

12.    In addition to the multiple labels Defendants crafted to refer to the Equity Units, they ensured that public investors would perceive the Units as AIG's preferred shares.  In this regard:

A.    They listed the Equity Units for trading on the NYSE under the ticker symbol ***"AIGpA."***  They did so with full awareness that the subject ticker symbol would persuade or, at least, confuse "public investors" to believe that the Equity Units represented ***"preferred shares"*** of AIG.  Although not all preferred shares include the small "p" in their ticker symbols, those with the "p" designation – such as "AIGpA" – are routinely and without exception understood to indicate the "preferred shares" of the issuers including AIG; [P.E. # 3, page S-80]

B.    In furtherance of their intent to misguide public investors, they labeled and disbursed the distribution of common shares due on the exchange dates as "tax exempt dividend" which is a feature of preferred shares.

C.    Despite such basic and commonly shared knowledge and understanding among the investing public, Defendants *audaciously deny* that the Equity Units transacted as "AIGpA" through the instrumentalities of interstate commerce ever represented, implied or conveyed "preferred shares" of AIG.

D.    If, indeed, the Defendants did not intend  "public investors" to misapprehend or confuse the Equity Units as preferred shares, they could have opted for and designated the Units under the symbol "AIG/U" on the NYSE or other exchange as is the case with corporations that list units for trading on the exchanges.  The "/U" is a common indicator of security units.

13.    Plaintiffs' aver that Defendants knew or should have known that the Prospectus for the Equity Units, in content and substance, was far beyond the realm, ability, practice and capacity of individual or public investors to understand or make any informed decision as to their investments

when made available to public investors on the exchanges.

14.     The smokes-and-mirrors in which the Equity Units are shrouded in the Prospectus appear to be somewhat lifted by the representations of AIG's Investor Relations as follows:

> "The AIG Equity Units are a mandatory convertible security that converts into AIG common stock on three separate dates, February 15, 2011, May 1, 2011 and August 1, 2011.  After the August 1, 2011 conversion there will no longer be an AIG Equity Unit security."

15.     This Complaint seeks redress for the Plaintiffs who have been denied the exchange (conversion) value of their securities by Defendants' extraordinary neglect of their covenant of good faith and fair dealing or outright bad faith conversion to themselves of Plaintiffs' investment returns.

**Offering of the Equity Units and Initial Subscriptions:**

16.     AIG's Equity Units offering consisted of 72,000,000 units at $75.00 (seventy five dollars) per unit.   In addition, 6,400,000 "over-allotment" Equity Units were issued to the underwriters at $1.3125 per unit, i.e. a 98.25% discount on the issue price of the units!  Subject to an *"underwriting agreement, dated May 16, 2008,"* (never disclosed to "public" or retail investors) AIG sold all of the Equity Units to the underwriters (the "Who's Who" of Wall Street titans) with specific proviso authorizing the underwriters to sell the Equity Units "*to the public* ... initially ... at the price set forth on the cover of the prospectus supplement," i.e. $75.= per unit.   For their commitments, the underwriters were offered multiple other discounts, fees and commissions not otherwise made available to "public (retail) investors" on whom the Equity Units were eventually dumped [P.E. #3, page S-79-80, italics added].  As a result of this offering, AIG grossed *five billion eight hundred and eighty eight million [5.88 billion] dollars*. *[P.E. # 4].*

7

17.    The Underwriter purchasers of the Equity Units were as follows:

"We and the underwriters named below have entered into an underwriting agreement, dated May 16, 2008, with respect to the Equity Units. Subject to certain conditions, each underwriter has severally agreed to purchase the number of Equity Units indicated in the following table.

**Underwriters**

| | Number of Equity Units |
|---|---|
| Citigroup Global Markets Inc. . . . . . . . . | 24,607,800 |
| J.P. Morgan Securities Inc. . . . . . . . . . . . | 24,607,800 |
| Banc of America Securities LLC . . . . . . . | 4,320,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated . . . . . . . . . . . . . . . . . . . ...... | 4,320,000 |
| Morgan Stanley & Co. Incorporated . . . | 4,320,000 |
| UBS Securities LLC . . . . . . . . . . . . . . .. | 4,320,000 |
| Wachovia Capital Markets, LLC. . . . . . . | 4,320,000 |
| Dowling & Partners Securities, LLC. . . . | 306,000 |
| Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC . . | 306,000 |
| Keefe Bruyette & Woods, Inc. . . . . . . . . . . . | 306,000 |
| The Williams Capital Group, L.P. . . . . . . . . | 108,000 |
| Loop Capital Markets, LLC . . . . . . . . . . . . . | 39,600 |
| Muriel Siebert & Co., Inc. . . . . . . . . . . . . . . | 39,600 |
| Toussaint Capital Partners, LLC . . . . . . . . . | 39,600 |
| Utendahl Capital Group, LLC. . . . . . . . . . . | 39,600 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72,000,000 |

"The underwriters are committed to take and pay for all the shares of Equity Units being offered, if any are taken.

"**Option to Purchase Additional Equity Units**
If the underwriters sell more Equity Units than the total number set forth in the table above, the underwriters have an option to buy up to 6,400,000 additional Equity Units from AIG to cover such sales. The underwriters may exercise that option for 13 days from May 16, 2008. If any Equity Units are purchased pursuant to this option, the underwriters will severally purchase Equity Units in approximately the same proportion as set forth in the table above."
[P.E. # 3, page S-79]

**Gravamen of the Equity Units as Convertible Securities: The Bait**

18.     Although conceived as "stock purchase contracts," the Equity Units were structured as securities mandatorily convertible into AIGs common shares.  Each Equity Unit was issued for an *"initial stated amount of $75."*   For this purpose, each Equity Unit is divided into three $25.- tranche with each tranche to convert to common shares on specific *"settlement dates."*  Thus, the first $25.= tranche of each Equity Unit was scheduled to convert to AIG's common share on *February 15, 2011.*  On the date of such conversion, the "initial stated amount of $75.=" is adjusted down by $25.= (the equivalent of the conversion) to an "adjusted stated amount of $50.=" per unit. The second $25 tranche comprised of each Equity Unit with "adjusted stated amount of $50.=" was scheduled to convert to AIG's common shares on *May 1, 2011* in an amount equivalent to $25.=  On said settlement date, the $50 "adjusted stated amount" of each  Equity Unit is further adjusted down by $25.- to its third and final adjusted amount of $25.=  This tranche was to convert into AIG's common stock on *August 1, 2011* after which "there will no longer be an AIG Equity Unit security."

19A.    In its Prospectus, AIG left no doubt that the Equity Unit's conversion or "settlement rate" into AIG's common shares on each of the Units' conversion dates was lettered, intended and represented to ensure an underlying equivalent value of $25.- in AIG's common shares [see P.E. # 3 pp. S-39 - S-42].  For this purpose, the Equity Units' applicable conversion rate on their scheduled settlement dates was directly intertwined with the average market value of the common shares over a defined period of time preceding each of the three conversion or settlement dates. Thus, the Prospectus provided:

"The *'applicable market value'* with respect to each stock purchase date means the average of the volume-weighted average prices of our common stock ... on each of the 20 consecutive trading days ending on the third trading day immediately preceding such stock purchase (conversion) date." [P.E. # 3, page S-7].

19B.    Defendants went further to underscore their representations as to the conversion or exchange rate for the Equity Units on the specified settlement dates.  They provided a diagram and chart reiterating their commitments to the Equity Unit holders. [See P.E. # 3, page S-17].

20.    Subject to what Defendants called "Anti-Dilution Adjustments" (see below the Formulas of Bad Faith), the representations Defendants made as to the conversion rates for the Equity Units left no doubt about the returns Equity Units investors were to expect.  To wit, the Prospectus provided:

"• If the applicable market value of our common stock is equal to or greater than the threshold appreciation price of $45.60*, 0.54823 shares of our common stock, which is approximately equal to $25 divided by the threshold appreciation price*, and which we refer to as the "*minimum settlement rate*.""

"Accordingly, if the market value for the common stock increases between the date of this prospectus supplement and the period during which the applicable market value is measured and the applicable market value is greater than $25, the aggregate market value of the shares of common stock issued upon settlement of a stock purchase contract on the applicable stock purchase date will be higher than $25, assuming that the market price of the common stock on the stock purchase date is the same as the applicable market value of the common stock.  However, you will only participate in 83.33% of the appreciation of our common stock in excess of the threshold appreciation price. In other words, for every dollar of appreciation of our common stock in excess of the threshold appreciation price, you will receive $0.83 of that appreciation. If the applicable market value is the same as the threshold appreciation price, the aggregate market value of the shares issued upon settlement will be equal to $25, assuming that the market price of the common stock on the applicable stock purchase date is the same as the applicable market value of the common stock.

"• If the applicable market value of our common stock is less than the threshold appreciation price but greater than the reference price of $38.00, a number of shares of our common stock equal to $25 divided by the applicable market value.

"Accordingly, if the market value for the common stock remains above the reference price between the date of this prospectus supplement and the period during which the applicable market value is measured, but the applicable market value is less than the threshold appreciation price and greater than the reference price, the aggregate market value of the shares of common stock issued upon settlement of a stock purchase contract on the stock purchase date will be equal to $25, assuming that the market price of the common stock on the applicable stock purchase date is the same as the applicable market value of the common stock.

"• If the applicable market value of our common stock is less than or equal to the reference price of $38.00, *the settlement rate will be 0.6579 shares of our common stock,* which is approximately equal to $25 divided by the reference price, and which we refer to as the "*maximum settlement rate*" and together with the minimum settlement rate as the "*fixed settlement rates*."

"Accordingly, if the market value for the common stock decreases below the reference price between the date of this prospectus supplement and the period during which the applicable market value is measured and the applicable market value is less than the reference price, the aggregate market value of the shares of common stock issued upon settlement of a stock purchase contract on the applicable stock purchase date will be less than $25, assuming that the market price on the applicable stock purchase date is the same as the applicable market value of the common stock. If the applicable market value is the same as the reference price, the aggregate market value of the shares issued upon settlement will be equal to $25, assuming that the market price of the common stock on the applicable stock purchase date is the same as the applicable market value of the common stock."  P.E. # 3, pp. S-39 - S-40. [Italics added].

21.    The Prospectus further underscores that Equity Units holders will absorb the entire loss associated with the decline in the value of AIG's common shares during the specific periods prescribed for the computation of "the applicable market value of the common stock" with respect to each settlement date set for the conversion of the Equity Units into AIG's common shares.  It provides:

"There can be no assurance that *the market value of our common stock on the three stock purchase dates* will not be less than the price paid by you for the Equity Units. If the applicable market value of the common stock on any of the stock purchase dates is less than the reference price of $38.00, the market value of the common stock issued to you pursuant to the stock purchase contract on such stock purchase date (assuming that the market value on such date is the same as the applicable market value of the common stock) will be less than the effective price per share paid by you on the date of issuance of the Corporate Units in this offering (assuming you purchased the Corporate Units for $75 each). Accordingly, you will bear the entire risk that the market value of the common stock may decline, and that the decline could be substantial and could result in a loss of all or a portion of your investment.

"In addition, because the number of shares delivered to you on each stock purchase date will be based upon *the applicable market value, which is in turn calculated on the basis of the average of the volume weighted average price per share of our common stock on each of the 20 consecutive trading days ending on the third trading day immediately preceding the applicable stock purchase date*, the shares of common stock you receive on the stock purchase date may be worth less than the shares of common stock you would have received had the applicable market value been equal to the volume weighted average price per share of our common stock on the applicable stock purchase date or a different period of days.  Also, to the extent that the shares of common stock are delivered after the applicable stock purchase date, you will bear the risk of a decline in the value of that common stock between the applicable stock purchase date and the date of delivery."  P.E. # 3, page S-22. [*Italics added*.]

22.    Based of these representations of the Defendants and underwriters:

A.    Plaintiffs who were holders of the Equity Units on FEBRUARY 15, 2011 aver that "the average of the volume weighted average price per share of AIGs common stock on each of the 20 consecutive trading days ending on the third trading immediately preceding" the settlement date of February 15, 2011 was far below "the reference price of $38.00."  Therefore, *they were entitled to the "maximum settlement rate" of 0.6579 common shares of AIG with respect to each Equity Unit they held*.

B.     Plaintiffs who were holders of the Equity Units on MAY 1, 2011 aver that "the average of the volume weighted average price per share of AIGs common stock on each of the 20 consecutive trading days ending on the third trading immediately preceding" the settlement date of May 1, 2011 was far below "the reference price of $38.00."  Therefore, *they were entitled to the "maximum settlement rate" of 0.6579 common shares of AIG with respect to each Equity Unit they held.*

C.     Plaintiffs who were holders of the Equity Units on AUGUST 1, 2011 aver that "the average of the volume weighted average price per share of AIGs common stock on each of the 20 consecutive trading days ending on the third trading immediately preceding" the settlement date of August 1, 2011 was far below "the reference price of $38.00."  Therefore, *they were entitled to the "maximum settlement rate" of 0.6579 common shares of AIG with respect to each Equity Unit they held.*

**Formulas of Bad Faith:**

23.     The Defendants never intended to fulfill their afore-going commitments to the Equity Units holders.  In such order, they permeated the 205-page, all in fine print, Prospectus with incomprehensible formulas to camouflage their bad faith intent to abnegate their commitments as to the exchange value of the Equity Units.  Thus, in bad faith, Defendants enunciated what they called "Anti-Dilution Adjustments" and "Reorganization Events."  The formulas included the following:

**"Anti-Dilution Adjustments**
Each fixed settlement rate will be adjusted, without duplication, if certain events occur:
(1) the issuance of our common stock as a dividend or distribution to all holders of

13

our common stock, or a subdivision or combination of our common stock, in which event each fixed settlement rate will be adjusted based on the following formula:

$SR1 = SR0 \times (OS1 / OS0)$

where,

SR0 = the fixed settlement rate in effect at the close of business on the record date
SR1 = the fixed settlement rate in effect immediately after the record date
OS0 = the number of shares of our common stock outstanding at the close of business on the record date prior to giving effect to such event
OS1 = the number of shares of our common stock that would be outstanding immediately after, and solely as a result of, such event

"(2) the issuance to all holders of our common stock of certain rights, options or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights, options or warrants to purchase shares of our common stock at less than the current market price of our common stock as of the record date, in which event each fixed settlement rate will be adjusted based on the following formula:

$SR1 = SR0 \times (OS0 + X) / (OS0 + Y)$

where,

SR0 = the fixed settlement rate in effect at the close of business on the record date
SR1 = the fixed settlement rate in effect immediately after the record date
OS0 = the number of shares of our common stock outstanding at the close of business on the record date
X = the total number of shares of our common stock issuable pursuant to such rights, options or warrants
Y = the aggregate price payable to exercise such rights divided by the average of the VWAP of our common stock over each of the ten consecutive trading days prior to

the business day immediately preceding the announcement of the issuance of such rights

However, each fixed settlement rate will be readjusted to the extent that any such rights or warrants are not exercised prior to their expiration.

"(3) the dividend or other distribution to all holders of our common stock of shares of our capital stock (other than common stock), rights to acquire our capital stock or evidences of our indebtedness or our assets (excluding any dividend, distribution or issuance covered by clauses (1) or (2) above or (4) or (5) below) in which event each fixed settlement rate will be adjusted based on the following formula:

$SR1 = SR0$
$x\ SP0 / (SP0 \quad FMV)$

where,

SR0 = the fixed settlement rate in effect at the close of business on the record date
SR1 = the fixed settlement rate in effect immediately after the record date
SP0 = the current market price as of the record date

14

FMV = the fair market value (as determined in good faith by our board of directors, whose good faith determination will be conclusive), on the record date, of the shares of capital stock, rights to acquire capital stock, evidences of indebtedness or assets so distributed, expressed as an amount per share of our common stock

"However, if the transaction that gives rise to an adjustment pursuant to this clause (3) is one pursuant to which the payment of a dividend or other distribution on our common stock consist of shares of capital stock of, or similar equity interests in, a subsidiary or other business unit of ours, (i.e., a spin-off) that are, or, when issued, will be, traded on a U.S. securities exchange, then each fixed settlement rate will instead be adjusted based on the following formula:

$SR1 = SR0$

$x (FMV0 + MP0) / MP0$

where,

$SR0$ = the fixed settlement rate in effect at the close of business on the record date

$SR1$ = the fixed settlement rate in effect immediately after the record date

$FMV0$ = the average of the VWAP of the capital stock or similar equity interests distributed to holders of our common stock applicable to one share of our common stock over each of the 10 consecutive trading days commencing on and including the third trading day after the date on which "ex-distribution trading" commences for such dividend or distribution with respect to our common stock on the NYSE or such other national or regional exchange or market that is at that time the principal market for our common stock

$MP0$ = the average of the VWAP of our common stock over each of the 10 consecutive

trading days commencing on and including the third trading day after the date on which "ex-distribution trading" commences for such dividend or distribution with respect to our common stock on the NYSE or such other national or regional exchange or market that is at that time the principal market for our common stock

"(4) we make a distribution consisting exclusively of cash to all holders of our common stock, excluding (a) any cash dividend on our common stock to the extent that the aggregate cash dividend per share of our common stock does not exceed (i) $0.22 in the then current fiscal quarter in the case of a regular quarterly dividend or (ii) $0.88 in the prior twelve months in the case of a regular annual dividend (each such number, the "*dividend threshold amount*"), (b) any cash that is distributed as part of a distribution referred to in clause (3) above, and (c) any consideration payable in connection with a tender or exchange offer made by us or any of our subsidiaries referred to in clause (5) below, in which event, each fixed settlement rate will be adjusted based on the following formula:

$SR1 = SR0$

$x SP0 / (SP0 \quad C)$

where,

SR0 = the fixed settlement rate in effect at the close of business on the record date
SR1 = the fixed settlement rate in effect immediately after the record date
SP0 = the current market price as of the record date
C = the excess of the amount in cash per share we distribute to holders of our common stock over the dividend threshold amount

"The dividend threshold amount is subject to adjustment on an inversely proportional basis whenever the fixed settlement rates are adjusted, but no adjustment will be made to the dividend threshold amount for any adjustment made to the fixed settlement rates pursuant to this clause (4). For the avoidance of doubt, the dividend threshold amount will be zero in the case of a cash dividend amount that is not a regular quarterly or annual dividend.

"(5) we or one or more of our subsidiaries make purchases of our common stock pursuant to a tender offer or exchange offer by us or one of our subsidiaries for our common stock to the extent that the cash and value of any other consideration included in the payment per share of our common stock validly tendered or exchanged exceeds the VWAP per share of our common stock on the trading day next succeeding the last date on which tenders or exchanges may be made pursuant to such tender or exchange offer (the "*expiration date*"), in which event each fixed settlement rate will be adjusted based on the following formula:

*SR1 = SR0*
*x [(FMV + (SP1 x OS1)] / (SP1 x OS0)*

where,
SR0 = the fixed settlement rate in effect at the close of business on the expiration date
SR1 = the fixed settlement rate in effect immediately after the expiration date
FMV = the fair market value (as determined in good faith by our board of directors, whose good faith determination will be conclusive), on the expiration date, of the aggregate value of all cash and any other consideration paid or payable for shares validly tendered or exchanged and not withdrawn as of the expiration date (the "*purchased shares*")
OS1 = the number of shares of our common stock outstanding as of the last time tenders or exchanges may be made pursuant to such tender or exchange offer (the "*expiration time*") less any purchased shares
OS0 = the number of shares of our common stock outstanding at the expiration time, including any purchased shares
SP1 = the average of the VWAP of our common stock over each of the ten consecutive
trading days commencing with the trading day immediately after the expiration date.

16

"In addition, in no event will we adjust the fixed settlement rate to the extent that the adjustment would reduce the conversion price below the par value per share of our common stock.

"*Current market price*" of our common stock on any day, means the average of the VWAP of our common stock over each of the 10 consecutive trading days ending on the earlier of the day in question and the day before the ex-date with respect to the issuance or distribution requiring such computation. For purposes of this paragraph, "*ex-date*" means the first date on which the shares of our common stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such issuance or distribution.

"*Record date*" means, for purpose of this section, with respect to any dividend, distribution or other transaction or event in which the holders of our common stock have the right to receive any cash, securities or other property or in which our common stock (or other applicable security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of our common stock entitled to receive such cash, securities or other property (whether such date is fixed by our board of directors or by statute, contract or otherwise).   P.E. # 3, pp. S-48 - S-51.

24.     Plaintiffs aver that the Defendants and their underwriters knew and had every reason to know that these formulas are beyond the know-how, capacity, understanding, practice or means of "public investors" to make informed decisions as to their investments.  Indeed, these formulas are far beyond the expertise and means of even so-called "sophisticated investors" as the required data (and on-going daily variations thereof) to compute, adjust and project each element of each of the formulas is simply unavailable nor made available by the Defendants or underwriters to the investing public.  The Defendants did not have a scintilla of "good faith" basis to believe that these complex formulas are within the grasp of "public investors" who they targeted as final consumers of the Equity Units.

17

25.     Plaintiffs further aver that the Defendants and their underwriters concocted and agreed to these formulas to conceal, in extreme bad faith, their true intent of never fulfilling their commitments to the Equity Unit Holders as owners of securities mandatorily convertible into AIG's common shares upon the exchange rates they proffered.

26.     As though the formulas of bad faith were insufficient, the Defendants concocted additional subterfuge labeled "Reorganization Events" to further deprive Equity Unit Holders the rightful return on their holdings as mandatorily convertible securities into AIG's common shares. To wit: The 205-page, fine print Prospectus also provided:

**"Reorganization Events**
        "The following events, in each case as a result of which holders of our common stock are entitled to receive stock, other securities, other property or assets (including cash or any combination thereof) with respect to or in exchange for our common stock, are defined as "*reorganization events*":
        "• any consolidation or merger of AIG with or into another person or of another person with or into AIG (other than a consolidation or merger in which AIG is the continuing corporation and in which its shares of common stock outstanding immediately prior to the consolidation or merger are not exchanged for cash, securities or other property of another person); or
        "• any sale, transfer, lease or conveyance to another person of all or substantially all of the assets of AIG; or
        "• any statutory share exchange of shares of common stock of AIG with another person (other than in connection with a merger or acquisition); or
        "• any liquidation, dissolution or winding-up of AIG (other than as a result of or after the occurrence of a termination event (as defined below under "—Termination")).
        "The foregoing paragraph includes a phrase relating to a sale of all or substantially all of our assets. There is no precise, established definition of the phrase "substantially all" under applicable law.  Accordingly, your right to accelerate and settle such contract early as a result of a sale of substantially all of our assets may be uncertain.

        "Following the effective date of a reorganization event, the settlement rate relating to the Equity Units shall thereafter be determined by reference to, and settled in lieu of the applicable number of shares of our common stock through the delivery

of a corresponding number of, exchange property units. An "*exchange property unit*" means the kind and amount of securities, cash and other property receivable in such reorganization event (without any interest thereon, and without any right to dividends or distribution thereon which have a record date that is prior to the applicable stock purchase date, cash merger early settlement date or early settlement date) per share of our common stock by a holder of common stock that is not a person with which we are consolidated or into which we are merged or which merged into us or to which such sale, transfer, lease or conveyance was made, or with whom shares were exchanged pursuant to any such statutory share exchange, as the case may be, which person we refer to as a constituent person, or an affiliate of a constituent person, to the extent such reorganization event provides for different treatment of common stock held by our affiliates and non-affiliates. In the event holders of our common stock have the opportunity to elect the form of consideration to be received in such transaction, the exchange property unit that holders of the Corporate Units or Treasury Units will be entitled to receive will be deemed to be the weighted average of the types and amounts of consideration received by the holders of our common stock that affirmatively make an election.

"In the event of such a reorganization event, the person formed by such consolidation or merger or the person to whom such sale, transfer, lease or conveyance was made or with whom such statutory share exchange was made shall execute and deliver to the purchase contract agent an agreement, providing that the holder of each Equity Unit that remains outstanding after the reorganization event, if any, shall have the rights described in the preceding paragraph. Such supplemental agreement shall provide for adjustments to the amount of any securities constituting all or a portion of an exchange property unit which, for events subsequent to the effective date of such reorganization event, shall be as nearly equivalent as may be practicable to the adjustments provided for in this "—Anti-Dilution Adjustments" section.  The provisions described in the preceding three paragraphs shall similarly apply to successive reorganization events."  P.E. # 3 pp. S-51 - S-52.

27.    The Defendants knew and had every reason to know that the terms they concocted in language inclusive of sentences where *a single sentence alone contains 153 words* is far beyond even the reading comprehension of "public investors" as well as the public at large.  They did so in complete abnegation of their statutory good-faith duty to ensure that prospectuses provided to the investing public should be in simple, plain language and structure to avert misapprehension, confusion and loss.  Plaintiffs further aver that the Defendants and underwriters intended the contents of the Prospectus as herein recited to be within the province of specialized knowledge and

understanding exclusive to them, their advisers, Sullivan & Cromwell, LLP, members of the now-defunct AIG's Financial Products Unit, investment bankers and accounting titans.

**Defendants' Systemic Adverse Actions Against Equity Unit Holders ("the Switch": Abnegation of Covenant of Good Faith and Fair Dealing**

28.     In complete abnegation of their legal duties to act in good faith and fairly deal with the Equity Units holders, Defendants embarked upon distinct and specific measures designed to eradicate their commitments and convert and divert the returns due the EU holders to themselves. To wit:

A.     In its Prospectus, AIG disclosed that it had 2,594,237,019 common shares outstanding as at the date of the prospectus.  It also disclosed its intent to offer, concurrently with the Equity Units, additional 171,052,631 common shares along with 25,657,894 common shares to cover underwriters' over-allotment.  Thus, the total number of AIG's outstanding common shares against which the Equity Units were issued was *2,790,947,544 outstanding common shares* (inclusive of the new issuance.)  No where in its 205-page Prospectus did AIG suggest, infer or imply, far less disclose, that it deemed its outstanding common shares to be diluted or are subject to anti-dilution measures.  Indeed, its issuance of nearly 200 million common shares concurrently with the Equity Units only leads to the inference that its common shares were not diluted and remain the basis upon which the Equity Units settlement values are to be assessed.

B.     In February 2009, Defendant embarked upon a reverse-split of its common shares. It chose a 20-for-1 reverse-split and reduced its outstanding common shares by a *factor of 20* from approximately *2.79 billion shares down to 134,926,293 (approximately 135 million)* common shares

[*P.E. # 5*].  On the basis of the reverse-split, it subjected the "settlement rates' for the Equity Units to a *vast downward adjustment by a factor of 20*.  Thus, the "maximum settlement rate" for the Units was reduced from *"0.6579" common shares per/EU down to "0.03289" common shares*.  Likewise, the "minimum settlement rate" of *"0.54823" common share per/EU was diminished to a mere "0.02741" common share per/EU* [P.E. # 4].  AIG did not provide a Notice to Equity Unit Holders with respect to the adjustments it embarked upon. [Please see below, ¶ 29].  Instead, the change was buried as a note to its 2009 financial statement at page 311 of over 450-pages, Form 10K.

C.      By February 2011, Defendant had already *inflated its 135 million outstanding shares to over 1.91 billion shares, i.e. by a factor of 14.2.  Its re-inflated common shares notwithstanding, AIG took no action to readjust the settlement rates for the Equity Units by any factor, far less the factor of 14.2 underlying the massive dilution of its common shares*.  Defendants simply chose the Equity Unit holders – who churned in $5.88 billion dollars – as immaterial to any decision they voluntarily engaged in exclusively in their self-interest and gain.  Hence, Equity Unit holders whose settlement or exchange rates was wiped out by more than 95% (ninety five percent) purportedly because of the so-called 20-for-1 reverse split were simply ignored when Defendants re-inflated the outstanding shares by over 1.8 billion shares!  Plaintiffs at bar were shunned in bad faith. "Fair dealing" did not cross AIG or its Board.

29.      Recognizing that the long-awaited (nearly three years) first "settlement date, i.e. February 15, 2011, was fast approaching, the Defendants decided to firm up and cement their oppressive actions against the Equity Unit holders.  Hence, on January 27, 2011 (less than three weeks before consummation of the conversion of the first tranche of the Equity Units), Defendants

21

issued a Notice to Equity Unit Holders propagating "the Switch" and conversion of Plaintiffs' investment returns to themselves. They granted themselves and their common shareholders extraordinarily generous warrant-dividends, each valued by the Board at over $23.= per warrant! Defendants announced their decision in a notice:

> "*To the Holders of Equity Units of*
>       AMERICAN INTERNATIONAL GROUP, INC.:
>
> "On January 19, 2011, American International Group, Inc. ("AIG") distributed warrants as a dividend to holders of record of AIG common stock as of the close of business on January 13, 2011(the "Record Date"), with each warrant representing the right to purchase one share of Common Stock at an initial exercise price of $45.00, subject to the exercise price adjustment provisions and other terms and conditions of the Warrant Agreement, dated January 6, 2011, between the Company and Wells Fargo Bank, N.A., as Warrant Agent.
>
> "As a result of this dividend, the maximum settlement rate for the stock purchase contracts included in your Equity Units is equal to 0.04156 and the minimum settlement rate is equal to 0.03463. In accordance with Section 5.04(a)(iii) of the Purchase Contract Agreement relating to the stock purchase contracts included in your Equity Units, these new rates were determined by multiplying:
>
> "o      the rates in effect immediately prior to the Record Date by
>
> "o       the quotient of
>
> "o      the Current Market Price, equal to the average of the volume weighted average price per share of AIG common stock on the NYSE over each of the 10 consecutive NYSE trading days ending on the Record Date ($58.9652), divided by
>
> "o      the Current Market Price ($58.9652), minus the fair market value of the per share dividend amount on the Record Date (as determined in good faith by a duly authorized committee of AIG's board of directors) ($12.2966, equal to $23.0302 per warrant, based on the volume weighted average price of the warrants on the NYSE on the Record Date, multiplied by 0.533933 warrants per share of common stock)." *P.E. # 6.*

30.     Upon such Notice predicated on their multitude formulas of bad faith as set forth above, the Defendants completely abnegated the *"fixed settlement (conversion) rates"* for the Equity Units proffered in AIG's regulatory filed Prospectus.  They arbitrarily demolished the *"minimum settlement (conversion) rate"* for each $25.= tranche of the Equity Units *from "0.54823" common share down to an absurd "0.03463" common share,* i.e. MORE THAN FIFTEEN TIMES BELOW THE CONVERSION RATE REPRESENTED AND WIPING OUT 94% OF THE UNIT'S CONVERSION VALUE PROFFERED IN THE PROSPECTUS!  Likewise, Defendants demolished *"the maximum settlement rate"* for each Equity Unit's $25.- tranche *from "0.6579" common share down to a ridiculous "0.04156,"* i.e. MORE THAN FIFTEEN TIMES BELOW THE SETTLEMENT (CONVERSION) RATE REPRESENTED IN THE PROSPECTUS, WIPING OUT 94% OF THE UNIT'S CONVERSION VALUE!  Considering the 95% plus loss in settlement rates Equity Unit holders were subjected to purportedly because of the so-called 20-for-1 reverse-split, the final adjustment of the loss to 94% is too meaningless to address the victimization of the Plaintiffs by Defendants' reckless disregard of good faith and fair dealing and their outright bad faith.

31.     Plaintiffs aver that, to their knowledge and understanding, the Notice issued by the Defendants was not filed with the Securities and Exchange Commission although it substantially and materially altered the terms of the Prospectus filed with the Commission.  Plaintiffs further aver that each of the individual Defendants, as members of AIG's Board, were individually and personally beneficiaries of their decision to issue warrants against the interests of the Equity Unit Holders thereby converting and transferring the gargantuan warrant-dividends to themselves as holders of AIG's common shares.

32.     Plaintiffs assert their rights to conventional, ordinary and commonsense use of terms and concepts tangent to their investments.  The extraordinarily generous warrant-dividend of over $23.- per warrant Defendants granted themselves and their common stock holders does not represent any event that can be called "Anti-Dilution" of the outstanding common shares.  The contrary is true.  Each warrant, *per se*, is the birth-mother of additional common shares that dilute the number of outstanding shares.  Defendants' perverse depiction of the issuance of ultra-generous warrants as "Anti-Dilution" measure is akin to describing Old Glory as black, yellow and purple!

33.     Plaintiffs further submit that there was no business necessity nor any adverse market condition for the equities of the Defendant that justified the issuance of the warrant-dividends in January 2011.  Defendants intended their decision to ensure a pretext ["as a result of this dividend ..."] for cementing their resolve to deprive Equity Unit holders the investment return they awaited for nearly three years.

34.     In such order, Plaintiffs aver that the Defendants have subjected them to extreme bad faith and unfair dealing; or have, otherwise unjustly enriched themselves by converting to themselves Plaintiffs' legitimate and rightful investment returns.

## CAUSES OF ACTION

### COUNT I
### Breach of Covenant of Good Faith and Fair Dealing in Violation of
### the Laws of the State of New York

35.     Plaintiffs repeat and reallege each of their averments heretofore and incorporate them by reference as if fully set forth herein.

24

36.     Defendants have made choice of law and prescribed the laws of the State of New

York as the "governing law" with respect to the Equity Units.  See P.E. # 3, page S-59.  As such,

New York law controls this Count of Plaintiffs' causes of action.

37.     "Under New York law, there exists in every contract a covenant of good faith and fair

dealing" *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 508 (S.D.N.Y., 1994) citing *Carvel*

*Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 230 (2d Cir. 1991).  "The covenant of

good faith and fair dealing precludes parties to a contract from engaging in conduct that will destroy

or injure the right of the other party to receive the benefits of the contract." *Id.*, citing *Filner v.*

*Shapiro,* 633 F.2d 139, 143 (2d Cir. 1980).  Restated: The covenant "embraces a pledge that neither

party shall do anything which will have the effect of destroying or injuring the right of the other party

to receive the fruits of the contract." *511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d

144, 153 (2002);  *Dalton v. Educational Testing Serv.*, 87 N.Y. 2d. 384, 389; 663 N.E.2d. 289

(1995).  Further held:

> "Under New York law, all contracts contain an implied agreement that neither party
> may engage in conduct which would interfere with the other party's right to realize
> the benefit of the bargain, even if such conduct is not specifically prohibited by the
> contract. {Citations omitted.} .... Consequently, a party may breach the implied
> covenant of good faith and fair dealing even if that party's conduct does not
> contravene the express provisions contained within the four corners of the written
> agreement." *Bear Stearns Funding v. Interface Group-Nevada,* 351 F.Supp. 2nd 283,
> 298 (S.D.N.Y. 2005).

38.     New York law also requires disposition by jury of breach of the covenant.  Held:

"[W]hether a party to a contract has failed to act in good faith is generally a fact question for the

jury" *Grant v. Pratt & Lambert,* 52 A.D. 540,, 65 N.Y.S. 486, 491 (1st Dep't 1900); See also

*Tepedino v. City of Long Beach*, 226 A.D.2d 446, 640 N.Y.S.2d 591, 592 (2nd Dept. 1996). Reasoning: " ... a party's good faith, which necessitates examination of a state of mind is not an issue readily determinable on a motion for summary judgment." *Bear Stearns Funding v. Interface Group-Nevada,* 351 F.Supp. 2nd 283, 294 (S.D.N.Y. 2005) citing *Coan v. Estate of Chapin*, 156 A.D. 2nd 318, 319; 549 N.Y.S. 2nd 16 (1st Dep't 1989).

39.     Upon the predicates of their averments heretofore, Plaintiffs assert their cause of action against the Defendants for breach of the covenant of good faith and fair dealing in as much as, inter alia:

A.     The claim is imbued in the contents and structure of the Prospectus for the Equity Units and the subsequent actions taken by the Defendants between February 2009 and January 27, 2011.  The claim is commonly shared, as a class, by all "public investor" who acquired the units as re-marketed by the Defendants and their affiliates.

B.     Defendant has exceptional, unique and specialized knowledge and expertise in devising and promoting financial products.  Indeed, for twenty-four years, it established and operated AIG Financial Products Unit infamous for the manufacturing, marketing and distribution of "immensely profitable" and "deceptive" financial products permeated by "recklessness and greed." Against this background of specialized skill and expertise, it engineered the Prospectus for the Equity Units, entered into a private arrangement (contract) with its underwriters and *targeted* "public investors" as ultimate consumers of the Units.

C.       Although Defendants' specialized knowledge and expertise in engineering financial products would have, in good faith, required them to simplify the contents of the Prospectus knowing that the Equity Units would be "remarketed" to "public investors" by their equally sophisticated and specialized agents and underwriters, they took no action to protect the investing public from the incomprehensible nomenclatures and formulas they fabricated;

D.       Instead, Defendants permeated the Prospectus for the Equity Units with what appeared to be AIG's forthright commitment as to the "exchange or conversion" rates for the Equity Units for its common shares.  Right on the front-page of the Prospectus [P.E. # 3, cover], and multiple times thereafter in the 205-page fine print document (see, inter alia,  pp. S-6 - S-7; S-39 - S-40),  Defendants perpetuated and promoted the "maximum settlement rate" of 0.6579 common shares per Unit and "minimum settlement rate" of 0.54823 common shares per Unit as the conversion value of each Equity Unit on the "settlement dates" for the exchange, i.e. February 15, May 1 and August 1, 2011.  Indeed, they went so far as providing a diagram and chart iterating and reiterating their commitments to uphold the settlement rates for the Equity Units. [See P.E. # 3, page S-17].  Defendants left no doubt that the conversion rates proffered were to equate the approximate equivalent value of $25.- of each equity unit on each of the settlement dates.  The "settlement dates" were scheduled *almost three years* from the date of the issuance of the Prospectus, May 12, 2008.

E.       But this was all a bait to camouflage Defendants bad faith intent not to fulfill their commitments.  Upon the pretext of a 20-for-1 reverse-split of their common stock, Defendants wiped out the maximum and minimum settlement rates for the Equity Units by a factor of 20 or more than 95% (ninety five percent).  They then promptly reinflated their shares from a mere 135 million shares

to over 1.9 billion shares (by a factor of 14.2) and did absolutely nothing to readjust the settlement rates for the Units in complete abnegation of the rights of the Plaintiffs to realize the benefits of their bargain.  They did all they can to oppressively injure and destroy the legitimate investment returns due the Equity Unit holders.

F.      Absent good faith, Defendants went even so far as *inversely* defining the entirely voluntary and discretionary issuance of warrants as "anti-dilution" measure they may embark upon exclusively at their whims and wishes.  Absent good faith, they even relied upon the benefits of confusion they could garner from improper labeling and listing of the Equity Units under the ticker symbol "AIGpA" which public investors reasonably construe as symbol of AIG's preferred shares. Absent good faith, Defendants utilized their specialized knowledge and expertise to concoct a 205-page, fine-print prospectus in which they preserved for themselves the powers to betray the commitments they made to the Equity Unit holders and convert to themselves the returns due the Plaintiffs.

G.      Thus, less than four weeks (i.e. January 19, 2011) before the Equity Unit Holders (the Plaintiffs) were to receive the first "benefits of their deal" in the form of the "maximum settlement rate" of 0.6579 common shares of AIG for each Unit held on February 15, 2011, Defendants acted upon their formulas of extraordinary bad faith to issue themselves a gargantuan "warrant dividend" of $23.= per common share to the detriment of the Plaintiffs at bar whose investment return was reduced to a ridiculous "0.04156" common shares, wiping out 94 (ninety four) percent of each Equity Unit's conversion value!

28

H.      The January 19, 2011, distribution of one of the most generous warrant dividends to their common share holders – a dividend warrant of $23.0302 per common share – was duly approved by its board of directors, the Defendants.  Each member of the board was individually and personally a grand beneficiary of the decisions they made as holders of the common shares of AIG!

I.      Absolutely *no business necessity nor any market adversity to the common shares* of AIG justified the issuance of this immense warrant-dividend and gift.  Defendants promptly listed the warrants for trading on the NYSE.  And miraculously, they found an accurate ticker symbol for the warrants – AIG/WS, the "WS" representing, as is commonly understood, warrants!

J.      As earlier submitted, Defendants never intended to afford the Plaintiffs the exchange or conversion rates into common shares repeatedly represented in the Prospectus. It was on January 27, 2011 (less than three weeks before the first so-called "settlement date," i.e. February 15, 2011) that the Defendants, for the first time, disclosed their true intent not to fulfill their commitments. In a Notice dated January 27, 2011, they informed Holders of Equity Units (Plaintiffs) that their long awaited investment returns would be demolished by over 94%!  To wit, they wrote:

> "**As a result of this dividend**, the maximum settlement rate for the stock purchase contracts included in your Equity Units is equal to 0.04156 and the minimum settlement rate is equal to 0.03463."  P.E. # 6 [Emphasis added].

K.      It is apparent that those intentional complex formulas and inverse descriptions of commonly used and understood concepts were deployed to deprive the Plaintiffs at bar their rightful entitlement to the promised return on their investments.

L.      Wherefore, Plaintiffs assert their cause of action for breach of the covenant of good faith and fair dealing in violation of the laws of the Sate of New York.

## COUNT II

## Breach of Covenant of Good Faith and Fair Dealing in
## Violation of the Laws of the State of Delaware

40.     Plaintiffs repeat and reallege each of their averments heretofore and incorporate them by reference as if fully set forth herein.

41.     Delaware recognizes the covenant of good faith and fair dealing.  Held:

"[T]he implied covenant attaches to every contract .... [T]he implied covenant requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.'  Thus, parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms.  [Footnote citations omitted]."  *Dunlap v. State Farm Fire and Cas. Co.* 878 A2d. 434, 442 (Del 2005).

The covenant's purpose is further explained:

"The covenant of good faith and fair dealing, implied in every Delaware contract, arises from fundamental notions of fairness.  It is a judicial convention designed to protect the spirit of an agreement when, *without violating an express term of the agreement*, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." {Italics in original}.  *Superior Vision Services, Inc. v. Reliastar Life Insurance Company,* 2006 WL 2521426, page 6 (Del. Ch.).

42.     Upon their submissions heretofore, Plaintiffs submit that Defendants have breached the covenant of good faith and fair dealing utilizing extraordinarily oppressive and underhanded tactics to deny them the fruits of their bargain, i.e. the exchange rate in common shares for their Equity Units to which they were entitled absent Defendants breach of the covenant.

43.     Wherefore, Plaintiffs assert their cause of action for breach of the covenant of good faith and fair dealing in violation of the laws of the Sate of Delaware.

30

## COUNT III

## Bad Faith Breach of the Covenant of Good Faith and Fair Dealing in Violation of the Laws of the State of Delaware

44.     Plaintiffs repeat and reallege each of their averments heretofore and incorporate them by reference as if fully set forth herein.

45.     Under Delaware law, "(a) lack of good faith, or the presence of bad faith is actionable ...." *Dunlap, op. cit,* page 440.  To sustain a bad faith covenant breach claim:

> "... a plaintiff must demonstrate that the defendant's conduct was motivated by a culpable mental state.  In other words, the defendant's conduct must be driven by an improper purpose.
>
> "I emphasize that the implied covenant of good faith and fair dealing 'is particularly important ... in contracts that defer a decision at the time of contracting and empower one party to make that decision later.'  In such cases, the discretion-exercising party must exercise its discretion in good faith.  If it does not, it will run afoul of the implied covenant.  To prove that the defendant has failed to exercise its discretion in good faith, the plaintiff must show that the exercise of discretion was done in bad faith, – sic – (i.e. that it was motivated by an improper purpose or done with culpable mental state.) [Footnote citations omitted]." *Amirsaleh v. Board of Trade of the City of New York, Inc.*, 2009 WL 3756700, pages 6-7 (Del. Ch.).

46.     Upon their submissions heretofore, Plaintiffs have duly stated their cause of action for bad faith.  That the Defendants were driven by culpable state of mind and intent to deprive the Plaintiffs the returns due them is apparent, inter alia, from their actions as follows:

A.     Directing and implementing a 20-for-1 reverse-split of the common stock and utilize their voluntary action to quash the settlement rates for the Equity Units by more than 95% only to reinflate and massively dilute the same common shares, in less than a year, from 135 million to over 1.9 billion shares aware, all along, that such massive dilution required, in good faith, a corresponding

31

adjustment of the exchange (conversion) rates for the Equity Units, but failing to do so;

B.      Timing to grant themselves extraordinarily generous "warrant dividends," absent business necessity or adverse market conditions, less than three weeks before Plaintiffs were to garner the first of their investment returns.  And abusing their discretion, Defendants utilized their entirely voluntary action to the detriment of the Plaintiffs by wiping out over 94% of the exchange value of the Equity Units. Bad faith cannot have a more glaring picture than what Defendants' actions depict.

47.      Wherefore, Plaintiffs assert their cause of action for bad faith breach of the covenant of good faith and fair dealing in violation of the laws of the Sate of Delaware.

### COUNT IV
### Plaintiffs' Alternative Cause of Action for Unjust Enrichment in Violation of the Laws of the State of Delaware

48.      Plaintiffs repeat and reallege each of their averments heretofore and incorporate them by reference as if fully set forth herein.

49.      Should for any reason relief be denied the Plaintiffs based upon the causes of action stated above, Plaintiffs, alternatively, state their cause of action for unjust enrichment.

50.      Delaware defines 'unjust enrichment' as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscious." *Fleer Corp v. Topps Chewing Gum, Inc.*, 539 A2d 1060, 1062 (Del. Supr. 1987).

32

51.     Stated: "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relationship between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." *Jackson Nat. Life Ins. Co. v. Kennedy,* 741 A2d 377, 393 (Del. Ch. 1999).

52.     As duly enunciated heretofore:

A.     Defendant enriched itself by issuing the subject Equity Units at a stated value of $75.- per unit and pocketing the substantial sum of 5.88 billion dollars;

B.     It committed to pay back the Equity Unit holders common shares equivalent to or approximating the stated value of each unit, which was $75.-, on the settlement dates it prescribed;

C.     Abusing their powers, Defendants then engaged in actions and decisions to reverse-split the 2.7 billion common shares they then had 20-for-1 down to 135 million shares.  They then used their voluntary decision  as a predicate to down-adjust the settlement values of the Equity Units by over 95%!  Within a year, Defendants re-inflated their outstanding common shares from 135 million to over 1.9 billion shares, by a factor of over 14, despite which they unjustly failed to re-adjust the settlement rates for the Equity Units.

D.     Less than three weeks before the first settlement date for its commitment, Defendant declared and distributed an exceptionally generous dividend warrant to its directors and common shareholders.  That the distribution of the warrants was to the precise detriment and impoverishment of the Plaintiffs is evident from the contents of the January 27, 2011 Notice it dispatched to Equity Unit holders [P.E. # 6] .  The Notice apprized them that because of the issuance of the dividends,

33

their Unit-to-common shares exchange rate would be demolished by over 94%!  *Defendants, thus,*

*cemented their pay-out to the Equity Unit holders to less than 6% (six percent) of the 5.88 billion*

*dollars they collected, i.e. approximately $353 million dollars in exchange for 5.88 billion dollars!*

The relationship between the enrichment and impoverishment is clearly established;

E.      There was no justification for reverse-splitting the common shares by a factor of 20

and re-inflate them back by a factor of over 14 but for the resultant unjust enrichment Defendants

garnered against the interests of the Equity Unit holders.  There is no hint of justification for the

extraordinary dividend the Defendants granted themselves and common share holders: No business

necessity.  No adverse market condition.  What prompted Defendants' actions was unjust and

unconscionable enrichment of themselves to avert their commitments to the Plaintiffs at bar.

F.      Wherefore, Plaintiffs' plead their cause of action for unjust enrichment in violation

of the laws of the State of Delaware.

**JURY TRIAL DEMAND**

53.      Plaintiffs assert their demand for jury trial with respect to all issues triable by right

to jury pursuant to the Seventh Amendment to the United States Constitution.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## PRAYER FOR RELIEF

WHEREFORE, upon their causes of action, Plaintiffs respectfully submit to this Honorable Court their prayer for relief as follows:

A. With respect to the Plaintiffs who were holders of the Equity Units on FEBRUARY 15, 2011 and entitled to the exchange of their units for Defendants common shares, the differential between what they were entitled to and what they received [i.e. 0.6579 less 0.04156] which is 0.61634 common share per Equity Unit calculated in cash at the closing market price of AIG's common share on February 15, 2011;

B. With respect to the Plaintiffs who were holders of the Equity Units on MAY 1, 2011 and entitled to the exchange of their units for Defendants common shares, the differential between what they were entitled to and what they received [i.e. 0.6579 less 0.04156] which is 0.61634 common share per Equity Unit calculated in cash at the closing market price of AIG's common share on May 1, 2011;

C. With respect to the Plaintiffs who were holders of the Equity Units on AUGUST 1, 2011 and entitled to the exchange of their units for Defendants common shares, the differential between what they were entitled to and what they received [i.e. 0.6579 less 0.04156] which is 0.61634 common share per Equity Unit calculated in cash at the closing market price of AIG's common share on August 1, 2011;

D. Punitive damages as a jury deems fit, just and appropriate with respect to Plaintiffs' causes of action that so justify;

E.      Plaintiffs costs, expenses, expert fees and reasonable attorneys fees as is customary in such proceedings; and

F.      Such additional and further relief as this Honorable Court may deem fit and proper.

## PLAINTIFFS' REQUEST FOR PROCEEDINGS PURSUANT TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

54.     Plaintiffs respectfully request this Honorable Court to grant class certification pursuant to Rule 23 of the Federal Rule of Civil Procedure and allow the proceedings in this matter to proceed as a class action thereunder.

RESPECTFULLY SUBMITTED,

/s/   Wendu Mekbib

Wendu Mekbib, D.C. Bar # 405156
Law Offices of Wendu Mekbib, P.C.
2540 Flint Hill Road
Vienna, Virginia  22181-5451
Tel: 703-242-7775
Fax: 703-242-7776
Email: myonaten@verizon.net

Attorney for the Plaintiff